UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                          :
**DAVID HERNANDEZ**, :
                          :
             Plaintiff, : **MEMORANDUM DECISION AND**
                          : **ORDER**
      – against – :   20 CV 3810 (AMD)
                          :
**COMMISSIONER OF SOCIAL SECURITY**, :
                          :
           Defendant. :
-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff challenges the Social Security Commissioner's decision that he was not

disabled for the purpose of receiving Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("the Act"). Before the Court are the parties' cross-motions for judgment on

the pleadings. (ECF Nos. 11, 14.) For the reasons set forth below, the plaintiff's motion for

judgment on the pleadings is granted, the Commissioner's motion is denied, and the case is

remanded for further proceedings consistent with this opinion.

## BACKGROUND

On February 27, 2015, the 34-year-old plaintiff, a former police officer, injured his left

shoulder at work while pursuing a criminal suspect, (*see* Tr. 69, 943, 946), an injury that

exacerbated his pre-existing back condition. (Tr. 951-52.) The plaintiff had surgery on his left

shoulder on August 27, 2015, (Tr. 626-28), but still had pain and reduced range of motion in his

left shoulder. (Tr. 596-97, 600-01.) The plaintiff's treating doctor concluded that the plaintiff

was "100% disabled" on January 11, 2016. (Tr. 592-93.) On January 27, 2017, the medical

board of the New York Police Department ("NYPD") approved the plaintiff's application for

accidental disability retirement ("ADR"), based on his back condition and the February 27, 2015 injury.  (Tr. 943-53.)

On July 12, 2021, the plaintiff applied for DIB, alleging disability since June 1, 2021 from various impairments, including the left shoulder injury.  (Tr. 189, 192.)  The plaintiff listed the following conditions in his application: herniated lumbar discs, a bulging thoracic disc, cervical/neck issues, a shifted patella in both knees, anxiety, a torn rotator cuff and labrum with left shoulder pain, vestibular disorder (vertigo), gastritis, gastroesophageal reflux disease (GERD), and sleep apnea.  (Tr. 192.)  The Social Security Administration ("SSA") denied the plaintiff's DIB claim on September 14, 2017.  (Tr. 123-27.)  The plaintiff then requested a hearing before an Administrative Law Judge.  (Tr. 130-35.)  On April 30, 2019, Administrative Law Judge Barry Best ("the ALJ") held a video hearing at which the plaintiff, represented by counsel, testified.  (Tr. 64-102.)  The plaintiff testified that he retired from the NYPD in May of 2017 after his ADR application was approved.  (Tr. 72-73.)  At the time of his retirement, the plaintiff was on restricted duty because of the injuries he suffered on February 27, 2015.  (*Id.*) The plaintiff is left-handed, and his left shoulder has felt "worse" since the August 27, 2015 surgery.  (Tr. 71, 86.)  In addition, the plaintiff said that he could not lift his left arm high and that he felt pain when he reached overhead and in front of himself.  (Tr. 86-87.)  Vocational expert Albert Sabella ("the VE") also testified at the hearing about the existence of jobs in the national economy that the plaintiff could perform.  (Tr. 93-102.)  The VE opined that the plaintiff could perform the following unskilled occupations that exist in significant numbers in the national economy: Electrical Accessories Assembler, Sealing Machine Operator, Assembler, and Carding Machine Operator.  (Tr. 96-98.)

In a June 4, 2019 decision, the ALJ determined that the plaintiff was not disabled and denied his claim for DIB.  (Tr. 10-21.)  The ALJ found that the plaintiff had the following severe impairments: degenerative disc disease, degenerative changes in the knees, migraine headaches with occipital neuralgia, vertigo and anxiety.  (Tr. 12.)  In his view, however, these impairments did not meet or medically equal the severity of any impairment listed in the applicable Social Security regulations.  (Tr. 13-14.)  The ALJ also found that the plaintiff had "the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b)" with certain limitations.  (Tr. 14.)  The ALJ stated that the plaintiff was "limited to occasional . . . stooping" and "should not reach beyond the area directly in front of him with the dominant left arm" or "perform work about the shoulder level bilaterally."  (*Id.*)  Finally, based on the VE's testimony, the ALJ ruled that although the defendant could not perform his past relevant work as a police officer or postal carrier, he could perform the four jobs identified by the VE.  (Tr. 19-20.)

On June 25, 2020, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision final.  (Tr. 1-6.)  The plaintiff filed this action on August 20, 2020, seeking judicial review of the Commissioner's denial of his DIB claim pursuant to 42 U.S.C. § 405(g) with respect to step five of the ALJ's disability analysis.  (ECF No. 1.)  On March 17, 2021, the plaintiff moved for judgment on the pleadings or, in the alternative, to remand the matter for further administrative proceedings.  (ECF No. 11.)  On June 16, 2021, the Commissioner filed a cross-motion for judgment on the pleadings.  (ECF No. 14.)

## STANDARD OF REVIEW

An ALJ employs a five-step sequential process to evaluate whether a claimant meets the definition of disabled under the Act.  *See* 20 C.F.R. § 404.1520(a)(4):

[I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1

> of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (internal quotation marks and citation omitted).

The claimant "bears the burden of proving his or her case" at steps one through four of this framework. *Id.* at 128 (citing *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004)). At step five, the burden shifts to the Commissioner, who must show that given the claimant's residual functional capacity ("RFC"), age, education and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997). A court reviewing a Commissioner's final decision to deny DIB must "determine[e] whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). Substantial evidence amounts to "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If substantial evidence exists to support the Commissioner's factual findings, those findings must be sustained. 42 U.S.C. § 405(g). A district court judge cannot substitute her own judgment for that of the Commissioner, "even if [she] might justifiably have reached a different result upon *de novo* review." *Cerqueira v. Colvin*, No. 14-CV-1134, 2015 WL 4656626, at *11 (E.D.N.Y. Aug. 5, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

Although the Commissioner's factual determinations are binding when they are supported by substantial evidence, a court will not defer to the Commissioner's decision

"[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (alteration in original) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Thus, "legal error alone can be enough to overturn the ALJ's decision."  *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009).

## DISCUSSION

### I.    Step Five Analysis

The plaintiff contends that the ALJ's conclusion at step five—whether the plaintiff was capable of working—was not supported by substantial evidence.[1]  Specifically, the plaintiff argues that the ALJ committed three related errors.  First, the plaintiff asserts that the ALJ did not resolve an apparent conflict between the VE's testimony and the descriptions in the *Dictionary of Occupational Titles* ("DOT")[2] of the four occupations the ALJ determined the plaintiff could perform.  (ECF No. 11 at 5-8; ECF No. 15 at 1-4.)  Second, the plaintiff claims that the ALJ should not have relied on the VE's job numbers testimony because the VE's methodology was unreliable.  (ECF No. 11 at 4, 7-10; ECF No. 15 at 3.)  Next, citing a Social Security ruling, SSR-96-9p, the plaintiff asserts that the ALJ should have considered whether the plaintiff's limited stooping and reaching ability meant that there was a "significant erosion" of the "occupational base" available to him.  (ECF No. 11 at 8-10.)

The Commissioner contends that the ALJ "elicited an adequate explanation to resolve the potential conflict between [the VE's] testimony and the DOT," and relied on the VE's expertise with respect to the kinds of occupations and number of jobs available to the plaintiff.  (ECF No.

---

[1] The parties do not dispute the ALJ's determination at steps one through four of the five-step evaluation process.  (ECF No. 11 at 5-10; ECF No. 14 at 14.)

[2] References to the DOT also include the DOT's companion publication, the Selected Characteristics of Occupation ("SCO").

14 at 15.)  The Commissioner also denies that SSR-96-9p applies to the facts of this case.  (*Id.* at 15-16.)

### a. Apparent Conflict

At step five, the Commissioner must establish that there are significant numbers of jobs in the national economy that the claimant can perform.  *See* 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).  An ALJ may make the step five determination "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).  VEs testify regularly about "the existence of jobs in the national economy, as well as . . . the claimant's ability to perform any of those jobs, given h[is] functional limitations," *Colon v. Comm'r of Soc. Sec.*, No. 00-CV-556, 2004 WL 1144059, at *6 (N.D.N.Y. Mar. 22, 2004), and may rely on the DOT in forming their opinions.  *See* 20 C.F.R. §§ 404.1566(d), 416.966(d).  However, while the DOT defines jobs, it does not include the number of those jobs that exist in the economy.  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012).  As a result, VEs must "obtain additional information to assess whether positions exist for the occupations disability claimants can still perform."  *Vandermark v. Colvin*, No. 13-CV-1467, 2015 WL 1097391, at *12 (N.D.N.Y. Mar. 11, 2015).  An ALJ may rely on a VE's testimony as long as substantial evidence supports the assumptions upon which the VE based his opinion, and those assumptions "accurately reflect the limitations and capabilities of the claimant involved[.]"  *McIntyre*, 758 F.3d at 151.

The ALJ found that the plaintiff could not reach outside the area directly in front of him with his left arm or do any bilateral work above his shoulder level.  (Tr. 14.)  The ALJ also accepted the VE's testimony that a hypothetical person of the plaintiff's age with the same RFC, education and work background could work as an Electrical Accessories Assembler, a Sealing

Machine Operator, an Assembler or a Carding Machine Operator.  (Tr. 19-20; 96-98.)
According to the DOT descriptions of these occupations, however, someone with the plaintiff's
limitations could not perform these jobs.

"The DOT gives a job type a specific code—for example, 295.467–026 Automobile
Rental Clerk—and establishes, among other things, the minimum skill level and physical
exertion capacity required to perform that job."  *Brault*, 683 F.3d at 446 (internal quotation
marks omitted).  The DOT specifies that the light-exertion positions of Electrical Accessories
Assembler (DOT code 729.687-010) and Sealing Machine Operator (DOT code 690.685-154)
require frequent reaching.  SCO, Part A, Titles Arranged by GOEG, SVP, and Strength Level.
The DOT also states that the sedentary positions of Assembler (DOT code 734.687-018) and
Carding Machine Operator (DOT code 681.685-030) require constant and frequent reaching.  *Id.*
"Reaching" includes overhead reaching.  *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87,
92 (2d Cir. 2019) (citing Social Security Ruling (SSR) 85-15, 1985 WL 56857, at *7 (Jan. 1,
1985)) (holding that reaching encompasses overhead reaching in light of common usage and a
1985 SSA policy defining reaching as "extending the hands and arms in any direction"); *see also*
SCO App'x C, Physical Demands (defining reaching as "extending arms in any direction").

The ALJ has the responsibility to "ask about any possible conflict" between VE
testimony and the DOT, and to get a reasonable explanation for any conflict before relying on
the VE's testimony.  *Lockwood*, 914 F.3d at 91 (citing SSR 00-4p, 2000 WL 1898704, at *2, 4
(Dec. 4, 2000)).  "[C]atch-all question[s] to the vocational expert regarding any inconsistencies
between the expert's testimony and the DOT do[ ] not satisfy [this] duty."  *Roberto v. Saul*, No.
20-CV-1923, 2021 WL 3912298, at *6 (E.D.N.Y. Sept. 1, 2021) (alterations in original) (quoting
*Patti v. Colvin*, No. 13-CV-1123, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015)).  Rather, the

ALJ must "undertake a meaningful investigatory effort" to uncover and resolve an apparent

conflict. *Lockwood*, 914 F.3d at 94 (internal quotation marks and citation omitted).

The ALJ did not reconcile the apparent discrepancy between the VE's testimony—that

the plaintiff could be an Electrical Accessories Assembler, a Sealing Machine Operator, an

Assembler or a Carding Machine Operator—and the DOT, which specifies that these jobs

require significant reaching, including reaching overhead.  The VE testified that the plaintiff

could perform the four occupations listed above, with one caveat: Because of the plaintiff's

restricted mobility in his left shoulder, he would only be eligible for approximately half of

Electrical Accessories Assembler and Seal-Machine Operator jobs, and three-quarters of

Assembler and Carding Machine Operator jobs, in the national labor market.  (*See* Tr. 96-98.)

The VE explained that the DOT does not distinguish between bilateral and unilateral

reaching, so he concentrated on the claimant's ability to reach with his dominant arm:

> [W]ith the limitation to the left arm and upper extremity, the [SCO] doesn't address
> limitations to one particular extremity.  When they talk about the fingering,
> handling, and reaching, it's bilaterally.  So, I tend to place more emphasis on a
> dominant extremity, and this was reaching limited to directly in front.

(Tr. 96.)  Although he "place[d] more emphasis" on the plaintiff's left dominant arm, the VE

nevertheless concluded that the plaintiff could handle occupations that require significant

reaching.  (Tr. 96-98.)  The VE reasoned that the number of available jobs for occupations

requiring frequent or constant reaching could be reduced in a non-arbitrary manner for a claimant

incapable of multi-directional reaching with his dominant arm.  (*See* ECF No. 11 at 4.)

At the administrative hearing, the VE opined that 200,000 Electrical Accessories

Assembler jobs and 175,000 Sealing Machine Operator jobs exist in the national labor market.

(Tr. 97.)  The VE relied on his market knowledge to estimate "conservatively" that a

hypothetical individual with the same "limitations to the left upper extremity" could perform half

8

(187,500) of those light-exertion jobs.  (Tr. 96-97.)   As the plaintiff argues, the VE seemed to

assume that the plaintiff's limited ability in his dominant arm reduced his reaching capacity by

only 50%, which, according to the VE, corresponds with a 50% reduction in the number of jobs

available to him.  (ECF No. 11 at 8.)  As for sedentary jobs, the VE posited that 100,000

Assembler jobs and 75,000 Carding Machine Operator jobs exist in the national labor market.

(Tr. 97-98.)  The VE reasoned that someone who could not use his dominant arm for most kinds

of reaching would be less hindered in the unskilled sedentary context, and could perform 75% of

the available Assembler jobs (75,000) and Carding Machine Operator jobs (56,250).  (*Id.*)

The VE's analysis is problematic for three reasons.  First, the VE did not explain how he

concluded that someone who could not fully reach with his dominant arm had only a 50%

decrease in reaching capacity.  Second, the VE apparently assumed that a 50% reaching capacity

translates to a 50% reduction in the number of jobs available, but this assumption has no

discernible logical basis.  As the plaintiff explains, "This would be like arguing that a person

who can only use his or her feet to operate brake pedals 25% of the time would be qualified to

perform 25% of the driving jobs in a given industry."  (ECF No. 11 at 4.)  Nor did the VE's

testimony resolve whether the plaintiff could actually do the four jobs the VE identified, given

that they require frequent or constant reaching.  The plaintiff cannot reach above his shoulder

level bilaterally or reach outside the area in front of him with his left dominant arm and can only

work in jobs that do not involve that kind of reaching.  (Tr. 14.)  The VE did not explain how

someone who cannot reach overhead bilaterally—and cannot reach beyond the area directly in

front of him with his left dominant arm—could work at any occupation that demanded frequent

or constant reaching.  As the plaintiff emphasizes, "[i]f a class of jobs requires, as an essential

element, frequent bilateral omni-directional reaching ability, then an individual who can only

9

reach directly in front of him or herself can not [sic] do that sort of job – period."  (ECF No. 11 at 4.)  As noted above, the VE's modification of the number of jobs available to the plaintiff does not explain whether the plaintiff can actually do the jobs.

Moreover, the ALJ did not seek clarification about the plaintiff's ability to perform the four occupations the VE identified.  (Tr. 98.)  Verifying that the VE's testimony comported with information in the DOT and SCO and "was consistent with [his] knowledge of jobs in the national labor market" was not sufficient.  (*Id.*)

The Second Circuit in *Lockwood*, which has a similar fact pattern, held that the duty to identify and resolve apparent conflicts between the DOT and VE testimony is "not fulfilled simply by taking the [VE] at his word."  914 F.3d at 93 (quoting *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362 (11th Cir. 2018)).  In *Lockwood*, the VE opined that the claimant fit the criteria for three occupations that the DOT characterizes as requiring occasional or frequent reaching, even though the claimant could not reach overhead.  914 F.3d at 92.  The ALJ's catch-all question to the VE about whether her testimony was consistent with the DOT was not enough to resolve the conflict.  *Id.* at 93-94.  The Second Circuit held that the ALJ should have determined whether the three occupations the VE recommended actually involved overhead reaching, and that while it was possible that no actual conflict existed, it was not the ALJ's place to "guess" what the three occupations enumerated by the VE "require[d] in reality."  *Id.* at 93-94 (internal quotation marks and citation omitted).  The ALJ was required to "teas[e] out such details" from the VE.[3]  *Id.* at 93.  *See also Roberto v. Saul*, 2021 WL 3912298, at *6 (finding that

---

[3] The Second Circuit rejected the district court's finding that the conflict was resolved because the VE apparently based her opinion on her own experience observing the performance of the three identified occupations.  *Id.* at 90, 93.

10

the ALJ did not "squarely" address the apparent conflict or procure a reasonable explanation from the VE that reconciled it, as mandated by *Lockwood*).

Because the ALJ did not resolve the apparent conflict between the DOT and the VE's testimony by "elicit[ing] an explanation that would justify crediting the testimony," *Lockwood*, 914 F.3d at 92, remand is required.  On remand, the ALJ should determine whether the plaintiff can actually perform the four jobs the VE identified, and re-evaluate his step five analysis.

    **b.  Job Numbers—Reliability of the VE's Methodology**

The plaintiff also makes the related argument that the Commissioner's step five conclusion is not supported by substantial evidence because the ALJ relied on flawed job numbers testimony.  According to the plaintiff, the VE's job numbers testimony cannot be viewed as substantial evidence because the VE's job reduction methodology has no logical or evidentiary foundation.  (ECF No. 11 at 4, 7-10; ECF No. 15 at 3.)

The ALJ does not have to establish with precision the number of jobs available to the claimant to support a finding that a claimant incapable of returning to his past occupations can transition to other work.  *Brault*, 683 F.3d at 450.  Rather, the ALJ need only find that there are a significant number of such jobs in the national economy.  *Id.*  As described above, the VE reduced the number of light-exertion jobs available to the plaintiff by 50% and the number of sedentary jobs available to the plaintiff by 25% because of the plaintiff's left shoulder condition. (Tr. 96-98.)  The VE submitted that, even with this sizable reduction, a significant number of jobs suitable for someone with the plaintiff's reaching limitations (over 300,000) exist in the national economy.  (*Id.*)

A VE need not disclose the exact figures or sources underlying his job numbers testimony as long as he names the sources he generally consulted.  *McIntyre*, 758 F.3d at 152

(citing *Brault*, 683 F.3d at 450).  The Second Circuit has held, however, that VE testimony

cannot be regarded as "substantial" evidence if it is "conjured out of whole cloth."  *Brault*, 683

F.3d at 450 (internal quotation marks and citation omitted).  The court in *Brault* did not elaborate

upon what kinds of VE testimony should be considered "conjured out of whole cloth," reserving

judgment on "the extent to which an ALJ *must* test [the reliability of] a VE's testimony" for

"another day and a closer case."  *Id.*  In the "absence of a definitive statement" from the Second

Circuit, then-Chief Judge Sharpe of the Northern District of New York surveyed court decisions

in this circuit addressing the issue of how to assess the sufficiency of VE job numbers testimony

and concluded:

> Courts generally accept as substantial evidence imprecise vocational expert
> opinions formed consistent with the methodology utilized by their professional
> contemporaries and based upon sources, materials and data generally deemed
> reliable.  "Experience" may provide the necessary foundation for vocational
> experts' testimony, especially when the record reflects that they personally
> performed actual market surveys or placed substantial numbers of clients within the
> jobs they identified as matching claimants' residual functional capacities.  Courts
> balk, however, when vocational experts provide incidence testimony based on
> broad occupation groupings without accounting for the fact that such groupings
> include more jobs tha[n] a particular claimant can perform, without adjusting those
> incidence numbers accordingly or when they otherwise inject meaningful
> uncertainty as to how adjustments are made.

*Vandermark*, 2015 WL 1097391, at *16.  In *Vandermark*, the VE used census data to estimate

the number of jobs available to the plaintiff.  *Id.* at *10.  This data "'d[id] a lot of grouping'" and

encompassed many jobs beyond the plaintiff's capacity.  *Id.* at *17.  To "account[] for the fact

that the statistical groupings on which he relied included more jobs that a person with

Vandermark's limitation c[ould] perform," the VE "adjusted those incidence numbers" by

reducing them by certain percentages to "factor out specific jobs."  *Id.*  The VE could not explain

the formula he used to break down the census numbers into more tailored estimates, but he did

describe the sources upon which he relied, including "standard statistical publications, cross-

12

referenced with practitioners' computer software" and his colleagues' input.  *Id.* at \*10, 16.

Judge Sharpe held that the VE's method for deriving job incidence numbers passed muster

because it "fit[] within the rubric of what courts . . . have determined to provide a foundation for

testimony rising to the level of substantial evidence."  *Id.* at \*17.  "While [the VE's] adjustments

were not made through application of formal theory or use of mechanical or technological aids,

[the VE's] panoptic experience permitted him to form a reliable opinion based on judgment,

instinct and effort."  *Id.*

Applying the same reasoning to these facts results in the opposite outcome.  As explained

earlier, the VE's job reduction methodology did not make sense and seemed to have been

"conjured out of whole cloth."  *Brault*, 683 F.3d at 450.  The VE reduced the number of light-

exertion jobs available to the plaintiff by half because of the plaintiff's reaching limitations.  (Tr.

97.)  Unlike the VE in *Vandermark*, the VE in this case surmised that the number of light-

exertion jobs and sedentary jobs would be reduced to 50% and 25%, respectively, without citing

any authoritative sources.  (Tr. 96-98; *see* ECF No. 15 at 3.)  By reducing the number of jobs in a

seemingly illogical fashion without giving at least a general overview of the sources upon which

he relied, the VE introduced "meaningful uncertainty" and confusion as to the number of jobs

available to an individual with the plaintiff's RFC.  *Vandermark*, 2015 WL 1097391, at \*16.

Because there is a legal error that requires remand, I do not decide whether the VE's job

reduction methodology "meets the requirements under applicable case law for providing a

foundation for VE testimony rising to the level of substantial evidence."  *Blake v. Colvin*, No.

14-CV-52, 2015 WL 3454736 at \*9 (D. Vt. May 29, 2015) (finding acceptable the opinion of a

VE who relied on a statistical publication in conjunction with his own vocational research to

determine the number of jobs and used his experience to reduce the number of jobs by 20%

13

because of the plaintiff's need for a sit-stand option).  Upon remand, however, the ALJ should

confirm whether the VE "form[ed] a reliable opinion based on judgment, instinct and effort."

*Vandermark*, 2015 WL 1097391, at \*17.

    **c.  SSR 96-9p—Erosion of the Occupational Base**

The plaintiff also argues that the ALJ did not apply SSR 96-9p, (ECF No. 11 at 8-10),

which sets forth guidance regarding the "extent of the erosion of the occupational base" for

claimants who cannot complete a full range of sedentary work.  61 Fed. Reg. 34478, 34483 (July

2, 1996).  The term "occupational base" is the approximate number of occupations that an

individual has the RFC to perform.  *Id.* at 34480.  "Where an individual is unable to perform the

full range of sedentary work, [his] occupational base will be eroded by additional limitations or

restrictions on [his] exertional and non-exertional capacities."  *Colon*, 2004 WL 1144059, at \*8.

"[W]hen the full range of sedentary work is significantly eroded," the claimant should "usually"

be deemed disabled.  *Id.* (quoting 61 Fed. Reg. at 34480).  That said, SSR 96-9p makes clear that

"a finding that an individual has the ability to do less than a full range of sedentary work does

not *necessarily* equate with a decision of 'disabled.'"  61 Fed. Reg. at 34479 (emphasis added).

The plaintiff argues that SSR 96-9p "require[s] a reasonable vocational analysis

regarding the potential erosion of the occupational base" for those whose limited stooping ability

and lack of bilateral manual dexterity make them incapable of doing the full range of unskilled

sedentary work.  (ECF No. 11 at 3.)  From the plaintiff's perspective, a reasonable VE would

have found that the plaintiff's occupational base was seriously eroded by his limited stooping

and reaching ability, pointing toward a finding of "disabled."  (*Id.*)

The plaintiff highlights the VE's opinion that the plaintiff's reaching limitations would be

less significant in the sedentary context, (ECF No. 11 at 9), which the plaintiff says does not

account for SSR-96-9's statement that "[a]ny significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base."  61 Fed. Reg. at 34482.

I agree with the Commissioner that SSR 96-9p does not apply to this case.  SSR 96-9p counsels ALJs to solicit expert testimony regarding the potential erosion of the occupational base for an individual "who is limited to less than occasional stooping."  61 Fed. Reg. at 34482. ("[R]estriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work.  Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.").  As the Commissioner explains, the plaintiff is limited only to occasional stooping.  (Tr. 14.) Furthermore, although SSR 96-9p mentions that sedentary unskilled occupations require good use of the hands and fingers, it "is silent regarding what impact such a significant restriction on the ability to reach would have on that occupational base."  *Merkley v. Comm'r of Soc. Sec.*, No. 16-CV-1394, 2017 WL 4512448, at *8 (N.D.N.Y. Oct. 10, 2017); *see also Bielecki v. Colvin*, No. 15-CV-193, 2017 WL 4053820, at *4 (W.D.N.Y. Sept. 14, 2017) (noting that SSR 96-9p does not contain references to reaching).

The issue here is not a lack of bilateral manual dexterity.  The ALJ found that the plaintiff had no limitation in fingering or handling objects with either hand, and the plaintiff does not challenge this determination.  (Tr. 14; *see* ECF No. 14 at 14.)  Thus, I reject the plaintiff's SSR 96-9p argument.

In short, remand is appropriate so that the ALJ can seek additional clarification from the VE, and reconsider the step five analysis.[4]

---

[4] I reject the plaintiff's request that I direct the Commissioner to assign a new ALJ to the case.  (ECF No. 11 at 18; ECF No. 15 at 4.)  Courts have ordered the Commissioner to reassign a case to a new ALJ on

## CONCLUSION

The plaintiff's motion for judgment on the pleadings is granted, and the Commissioner's motion is denied.  The case is remanded for further proceedings consistent with this opinion.

**SO ORDERED.**

                                   s/Ann M. Donnelly
                                   ANN M. DONNELLY
                                   United States District Judge

Dated: Brooklyn, New York
          December 16, 2021

---

remand where the ALJ's conduct "g[a]ve[ ] rise to serious concerns about the fundamental fairness of the disability review process[.]"  *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). An ALJ's "[l]egal error alone is insufficient to support a finding of bias."  *Lebron v. Colvin*, No. 13-CV-9140, 2015 WL 1223868, at *24 (S.D.N.Y. Mar. 16, 2015).  In this case, the ALJ expressed no bias or hostility toward the plaintiff, nor did he show a lack of impartiality or an unwillingness to apply the correct legal standard upon remand.  *See id.*